# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

FILED
CLERK'S OFFICE
U.S. DISTRICT COURT
U.S. DISTRICT COURT E.D.N.Y.

Steven M. Larimore
Court Administrator • Clerk of Court

★ FEB - 6 2012

701 Clematis Street, Rm 202
West Palm Beach, Florida 33401
(561) 803-3400

## TRANSMITTAL LETTER

LONG ISLAND OFFICE

TO: CLERK OF COURT

**ALFONSO M. D'AMATO UNITED STATES COURTHOUSE**
**FEDERAL PLAZA, ROOM 100**
**CENTRAL ISLIP, NY 11722**

FILED by _____ D.C.

JAN 1 9 2012

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

RE:          USA v SCOTT MULLIGAN
             Case No. MJ-11-1252
             SD/FL Case No. 11-8463-JMH

DATE:
=============================================================
The above-mentioned cause has been transferred to your jurisdiction pursuant
to Rule 40
Please find enclosed the following documents:

_____          Original file

___X___          Certified File

_____          Magistrate Proceedings -Original Pleadings

                 CASH Bond  Amount $_____
                 (Note: Cash is not included in this transmittal and will
                 be forwarded at a later date from the Financial Section)

Kindly acknowledge receipt of these documents by RECEIVE STAMPING the enclosed
copy of this letter and sending it to:

                 **UNITED STATES DISTRICT COURT**
                 **CLERK OF COURT c/o Tanya McClendon**
                 **701 CLEMATIS STREET, ROOM 202**
                 **WEST PALM BEACH, FLORIDA 33401**

                                 Yours sincerely

                                 By_____
                                 Tanya McClendon, Deputy Clerk

---

*The Mission of the Clerk's Office for the Southern District of Florida is to be the mechanism*
*for the judges, the bar, litigants, and the public, to resolve disputes in a just and efficient manner.*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

FILED

CLERKS OFFICE
U.S. DISTRICT COURT E.D.N.Y.

**Steven M. Larimore**
Court Administrator • Clerk of Court



701 Clematis Street, Rm 202
West Palm Beach, Florida 33401
(561) 803-3400

## TRANSMITTAL LETTER

### LONG ISLAND OFFICE

**TO:  CLERK OF COURT**

**ALFONSO M. D'AMATO UNITED STATES COURTHOUSE
FEDERAL PLAZA, ROOM 100
CENTRAL ISLIP, NY 11722**

```
FILED by _____ D.C.

JAN 1 9 2012

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.
```

**RE:**      USA v SCOTT MULLIGAN
             Case No. <u>MJ-11-1252</u>
             SD/FL Case No. <u>11-8463-JMH</u>

**DATE:**
====================================================================
The above-mentioned cause has been transferred to your jurisdiction pursuant
to Rule 40
Please find enclosed the following documents:

_____          Original file

___X___          Certified File

_____          Magistrate Proceedings -Original Pleadings

CASH Bond  Amount $_____
(Note:  Cash is not included in this transmittal and will
 be forwarded at a later date from the Financial Section)

Kindly acknowledge receipt of these documents by RECEIVE STAMPING the enclosed
copy of this letter and sending it to:

                **UNITED STATES DISTRICT COURT
                CLERK OF COURT c/o Tanya McClendon
                701 CLEMATIS STREET, ROOM 202
                WEST PALM BEACH, FLORIDA 33401**

                                Yours sincerely
                                By
                                Tanya McClendon, Deputy Clerk

---

*The Mission of the Clerk's Office for the Southern District of Florida is to be the mechanism
for the judges, the bar, litigants, and the public, to resolve disputes in a just and efficient manner.*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**Steven M. Larimore**
Court Administrator • Clerk of Court

701 Clematis Street, Rm 202
West Palm Beach, Florida 33401
(561) 803-3400

## TRANSMITTAL LETTER

**TO: CLERK OF COURT**

**ALFONSO M. D'AMATO UNITED STATES COURTHOUSE
FEDERAL PLAZA, ROOM 100
CENTRAL ISLIP, NY 11722**

FILED by _____ D.C.

**JAN 1 9 2012**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

**RE:**      USA v SCOTT MULLIGAN
            Case No. **MJ-11-1252**
            SD/FL Case No._11-8463-JMH

**DATE:**
=================================================================
The above-mentioned cause has been transferred to your jurisdiction pursuant
to Rule 40
Please find enclosed the following documents:

_____      Original file

__X___      Certified File

_____      Magistrate Proceedings -Original Pleadings

            CASH Bond  Amount $_____
            (Note:  Cash is not included in this transmittal and will
              be forwarded at a later date from the Financial Section)

Kindly acknowledge receipt of these documents by RECEIVE STAMPING the enclosed
copy of this letter and sending it to:

            **UNITED STATES DISTRICT COURT
            CLERK OF COURT c/o Tanya McClendon
            701 CLEMATIS STREET, ROOM 202
            WEST PALM BEACH, FLORIDA 33401**

                        Yours sincerely
                        By
                        Tanya McClendon, Deputy Clerk

Certified to be a true and
correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida
By_____ Deputy Clerk
Date _____ 1-19-12

*The Mission of the Clerk's Office for the Southern District of Florida is to be the mechanism
for the judges, the bar, litigants, and the public, to resolve disputes in a just and efficient manner.*

CLOSED

# U.S. District Court
## Southern District of Florida (West Palm Beach)
## CRIMINAL DOCKET FOR CASE #: 9:11-mj-08463-JMH-1
### Internal Use Only

Case title: USA v. Mulligan

Other court case number: MJ-11-1252 Eastern District of New York (Central Islip)

Date Filed: 12/23/2011

Date Terminated: 12/21/2011

Assigned to: Magistrate Judge James M. Hopkins

**Defendant (1)**

**Scott Mulligan**
Prisoner ID: 60271-053
*Language: English; YOB: 1967*
*TERMINATED: 12/21/2011*

represented by **Noticing FPD-WPB**
Email: wpb_ecf@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender Appointment*

**Pending Counts**

None

**Disposition**

**Highest Offense Level (Opening)**

None

**Terminated Counts**

None

**Disposition**

**Highest Offense Level (Terminated)**

None

**Complaints**

18:33.F

**Disposition**

Certified to be a true and correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida
By _____
Deputy Clerk
Date 1-19-12

**Plaintiff**

**USA**

represented by **Ellen L Cohen**
United States Attorney's Office
500 South Australian Avenue

Suite 400
West Palm Beach, FL 33401
561-209-1046
Fax: 659-4526
Email: Ellen.Cohen@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/21/2011 | 🔘 1 | Magistrate Removal of Complaint from the Eastern District of New York ( Central Islip) Case number in the other District MJ-11-1252 as to Scott Mulligan (1). (tmn) (Entered: 12/23/2011) |
| 12/21/2011 | 🔘 2 | Minute Entry for proceedings held before Magistrate Judge James M. Hopkins: Initial Appearance in Rule 5(c)(3)/Rule 40 Proceedings as to Scott Mulligan held on 12/21/2011, Removal Hearing as to Scott Mulligan held on 12/21/2011. (Digital 14:22:41.) (tmn) (Entered: 12/23/2011) |
| 12/21/2011 | 🔘 3 | Order on Initial Appearance as to Scott Mulligan for proceeding held on 12/21/2011 Attorney Noticing FPD-WPB for Scott Mulligan added for the defendant. Signed by Magistrate Judge James M. Hopkins on 12/21/2011. (tmn) (Entered: 12/23/2011) |
| 12/21/2011 | 🔘 4 | WARRANT OF REMOVAL ISSUED to District of the Eastern District of New York as to Scott Mulligan. Signed by Magistrate Judge James M. Hopkins on 12/21/2011. (tmn) (Entered: 12/23/2011) |
| 01/03/2012 | 🔘 5 | Report Commencing Criminal Action as to Scott Mulligan - YOB: **/**/1967 Prisoner #: 60271-053 (kza) (Entered: 01/04/2012) |
| 01/19/2012 | 🔘 6 | Transmittal Letter as to Scott Mulligan sent to the Eastern District of New York (Cental Islip) with certified copy of all documents in the Court file and the Docket Sheet. (tmn) (Entered: 01/19/2012) |



Certified to be a true and correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida

By _____
              Deputy Clerk

Date _____

FILED by _____ D.C.

JAN 0 3 2012

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

## REPORT COMMENCING CRIMINAL ACTION

UNITED STATES OF AMERICA          CASE # ___ *MJ-11-1252*
                                          *11-8463-JMH*
VS

*Scott M. Mulligan*          PRISONER # *60271-053*

*******************************************************************************
TO:   CLERK'S OFFICE, UNITED STATES DISTRICT COURT:     (CIRCLE ONE)

MIAMI     FT. LAUDERDALE     WEST PALM BEACH     ST. PIERCE
*******************************************************************************
*ALL ITEMS ARE TO BE COMPLETED  - INFORMATION NOT APPLICABLE OR
UNKNOWN TO BE INDICATED BY "N/A":*

1) DATE AND TIME OF ARREST: *12/21/11      0700*

2) LANGUAGE(S) SPOKEN: *English*

3) OFFENSE (S) CHARGED: *18 sec 33*

4) U.S. CITIZEN   [✓] YES   [ ] NO   [ ] UNKNOWN

5) DATE OF BIRTH: *//1967*

6) TYPE OF CHARGING DOCUMENT:   (CHECK ONE)
   [✓] INDICTMENT
   [ ] COMPLAINT TO BE FILED/ALREADY FILED
   [ ] BENCH WARRANT FOR FAILURE TO APPEAR
   [ ] PROBATION VIOLATION WARRANT
   [ ] PAROLE VIOLATION WARRANT

   ORIGINATING DISTRICT: *EDNY*

   COPY OF WARRANT LEFT WITH BOOKING OFFICER [✓] YES   [ ] NO

7) AMOUNT OF BOND: _____   WHO SET BOND: _____

8) ARRESTING/PROCESSING AGENT: *Gavin Gumbinner* DATE: *12/21/11*

9) AGENCY: *FBI*                    PHONE: *786-412-9479*

Certified to be a true and
correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida
By _____
Deputy Clerk
Date *1-19-12*

UNITED STATES OF AMERICA
SOUTHERN DISTRICT OF FLORIDA

CASE NO.   11-8463-JMH

UNITED STATES OF AMERICA,
    Plaintiff,

  v.

SCOTT MULLIGAN,

    Defendant.
_____/

```
FILED by _____ D.C.

DEC 2 1 2011

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.
```

## WARRANT OF REMOVAL

A(n) __X__ Complaint

_____ Indictment

_____ Information

_____ Probation Violation Warrant

_____ Supervised Release Violation Warrant

_____ Bench Warrant

_____ Violation of Pretrial Release Warrant

having been filed in the EASTERN DISTRICT OF NEW YORK charging the above named defendant with 18:33, 34 & 2, and the defendant having

__X__ been arrested

_____ surrendered

in the Southern District of Florida, having had an initial appearance before the Court and having:

__X__ waived further hearing

_____ been given a hearing in accordance

with Fed.R.Crim.P. 40.

having not posted the bail as set by the Court, the defendant is hereby committed to the custody of the United States Marshal for removal to the District where the charge is pending and delivery to the United States Marshal for that District or his lawfully authorized representative.

DONE AND ORDERED at West Palm Beach, Florida this 21ST day of DECEMBER, 2011.

*James M. Hopkins*

JAMES M. HOPKINS
UNITED STATES MAGISTRATE JUDGE

c: AUSA
  Defense
  Pretrial Services
  US Probation
  U.S. Marshal (2 certified copies)

```
Certified to be a true and
correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida
By _____ Deputy Clerk
Date   1-19-12
```

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.  11-8463-JMH

Certified to be a true and
correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida
By _____
Deputy Clerk
Date  1-19-12

UNITED STATES OF AMERICA

          Plaintiff,

v.

SCOTT MULLIGAN,
          Defendant.
_____/

FILED by _____ D.C.

DEC 2 1 2011

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## ORDER ON INITIAL APPEARANCE

AUSA  Sean Flynn/Ellen Cohen          Language     English
Agent_____          Prisoner No. _____

          The above-named defendant having been **arrested** on _____ having appeared before the court for initial appearance on _____12/21/2011_____and proceedings having been held in accordance with **Fed.R.Cr.P.** **r. 5 or 40(a)**, it is thereupon
          **ORDERED** as follows:

1. _____ appeared as permanent  counsel of record.
     Address:_____
     Zip Code: _____ Telephone: _____

2.  **FEDERAL PUBLIC DEFENDER**_____ appointed for purposes of the Initial Hearing.
     Address: _____
     Zip Code: _____ Telephone:  561-833-6288

3. The defendant shall attempt to retain counsel and shall appear before the court at 10:00 a.m. on _____, 2011.

4. _____ hearing is set for _____,2011.

5. The defendant is held in temporary pretrial detention pursuant to 18 U.S.C. Section 3142 (d) or (f) because _____.
     A **Detention Hearing**, pursuant to 18 U.S.C. Section 3142(f), is set for  **ordered removed**  2011.

6. The defendant shall be release from custody upon the posting of the following type of appearance bond, pursuant to 18 U.S.C. Section 3142:
     _____
     _____

This bond shall contain the standard conditions of bond printed in the bond form of this Court and, in addition, the defendant must comply with the special conditions checked below:

## COURT MINUTES

**U.S. MAGISTRATE JUDGE JAMES M. HOPKINS**    DATE: _12/21/2011_    TIME: _2:00 PM_

DEFT:    SCOTT MULLIGAN (J)    CASE NO:    11-8463-JMH

AUSA:    SEAN FLYNN  _Ellen Cohen_    ATTY:    _FPD-Robin Rosen Evans_

AGENT:    VIOL:    REMOVAL TO THE EASTERN
DISTRICT OF NEW YORK

PROCEEDING:    **INITIAL HEARING ON REMOVAL** _Identity Hearing_    BOND RECOMMENDATION:    **PTD (REQUESTED BY GOVT.)**

BOND/PTD HEARING HELD - yes / no    LANGUAGE:    ENGLISH

BOND SET @ _____    PRISONER NO. _____

| | | |
|---|---|---|
| ☐ | All Standard Conditions. | |
| ☐ | Surrender / or do not obtain passports / travel documents | |
| ☐ | Rpt to PTS as directed / or _____ x's a week/month by phone; _____ x's a week/month in person | |
| ☐ | Refrain from excessive use of alcohol | |
| ☐ | Participate in a mental health assessment and treatment | |
| ☐ | Random urine testing by Pretrial Services and/or treatment as deemed necessary | |
| ☐ | Not to encumber property. | |
| ☐ | Maintain or seek full - time employment/education. | |
| ☐ | No contact with victims / witnesses | |
| ☐ | No firearms. | |
| ☐ | May Not visit Transportation Establishments. | |
| ☐ | Travel extended to: _____ | |
| ☐ | Home Confinement/Electronic Monitoring/Curfew _____ paid by _____. | |
| ☐ | Other _____ | |

FILED by _____ D.C.

DEC 2 1 2011

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

Disposition: _Deft present / sworn Deft advised of charges & rights Deft questioned regarding appointment of counsel Deft will hire counsel Gov't suggests to the Court to appoint FPD to the Deft for the purpose of this hearing. Court appoints FPD. Deft will waive his right to have Detention Hearing. No Detention Hearing Held. Deft Detained_

| NEXT COURT APPEARANCE: | DATE: | TIME: | JUDGE: | PLACE: |
|---|---|---|---|---|
| REPORT RE COUNSEL: | | | | |
| PTD/BOND HEARING: | | | | |
| PRELIM/ARRAIGN. OR REMOVAL: | | | | |
| STATUS CONFERENCE: | | | | |

TIME IN COURT: _____

Certified to be a true and correct copy of the document on file Steven M. Larimore, Clerk, U.S. District Court Southern District of Florida By _____ Deputy Clerk Date _____

DAR: _14:22:41_

## COURT MINUTES

**U.S. MAGISTRATE JUDGE JAMES M. HOPKINS**    **DATE:** 12/21/2011    **TIME:** 2:00 PM

DEFT:    SCOTT MULLIGAN (J)    CASE NO:    11-8463-JMH

AUSA:    SEAN FLYNN    ATTY:    FPD - Robin Rosen-Evans

AGENT:    VIOL:    REMOVAL TO THE EASTERN DISTRICT OF NEW YORK

PROCEEDING:    **INITIAL HEARING ON REMOVAL** Identity Hearing    BOND RECOMMENDATION:    **PTD (REQUESTED BY GOVT.)**

BOND/PTD HEARING HELD - yes / no    LANGUAGE:    ENGLISH

BOND SET @    PRISONER NO.

| | | |
|---|---|---|
| ☐ | All Standard Conditions. | **Disposition:** Defense would like to have Identity hearing. Govt proffers as to the identity of the Deft. No argument from Defense. Court accepts proffer and identifies the Deft as the person identified in the Criminal Complaint. Deft may be transported to the EDO of New York by FBI Agents. Deft ordered removed |
| ☐ | Surrender / or do not obtain passports / travel documents | |
| ☐ | Rpt to PTS as directed / or _____ x's a week/month by phone; _____ x's a week/month in person | |
| ☐ | Refrain from excessive use of alcohol | |
| ☐ | Participate in a mental health assessment and treatment | |
| ☐ | Random urine testing by Pretrial Services and/or treatment as deemed necessary | |
| ☐ | Not to encumber property. | |
| ☐ | Maintain or seek full - time employment/education. | |
| ☐ | No contact with victims / witnesses. | |
| ☐ | No firearms. | |
| ☐ | May Not visit Transportation Establishments. | |
| ☐ | Travel extended to: _____ | |
| ☐ | Home Confinement/Electronic Monitoring/Curfew paid by _____ | |
| ☐ | Other _____ | |

| NEXT COURT APPEARANCE: | DATE: | TIME: | JUDGE: | PLACE: |
|---|---|---|---|---|
| REPORT RE COUNSEL: | | | | |
| PTD/BOND HEARING: | | | | |
| PRELIM/ARRAIGN. OR REMOVAL: | | | | |
| STATUS CONFERENCE: | | | | |

TIME IN COURT:    17 mins

DAR:

Page 2 of 2

11-8463-JMH

JMM:SCF/CNC
F.#2005R00138

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**MJ-11-1252**

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

SCOTT MULLIGAN,

          Defendant.

- - - - - - - - - - - - - - - X

FILED UNDER SEAL

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF ARREST
WARRANT

(18 U.S.C. §§ 33, 34
and 2)

EASTERN DISTRICT OF NEW YORK, SS:

     ROBERT F. SCHELHORN, Jr. being duly sworn, deposes and

says that he is a Special Agent with the Federal Bureau of

Investigation ("FBI"), duly appointed according to law and acting

as such.

     Upon information and belief, there is probable cause to

believe that, on or about June 23, 1994, within the Eastern

District of New York, the defendant SCOTT MULLIGAN, together with

others, willfully and with a reckless disregard for the safety of

human life, disabled and incapacitated Julius Baumgardt and

Walter Tully, who were drivers and persons employed in connection

with the operation of a motor vehicle used, operated and employed

in interstate commerce, to wit:  a Mid-Island armored van, and

lessened the ability of such persons to perform their duties,

which offense resulted in the death of Julius Baumgardt,

     (Title 18, United States Code, Sections 33, 34 and 2)

Certified to be a true and
correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida
By _____
Deputy Clerk
Date 1-19-12

__a. Surrender all passports and travel document to the Pretrial Services Office; .
__b. Report to Pretrial Services as follows:___times a week by phone, ___time a week in person;
    other: _____
_c. Submit to random urine testing by Pretrial Services for the use of non-physician-prescribed substances
    prohibited by law.
__d. Maintain or actively seek full time gainful employment/education.
__e. Maintain or begin an educational program.
__f. Avoid all contact with victims of or witnesses to the crimes charged.
__g. Refrain from possessing a firearm, destructive device or other dangerous weapon.
__h. Comply with the following curfew: _____
_ I. Avoid all commercial transportation facilities; no airports, no marinas, no bus terminals.
__j. Comply with the following additional special conditions of this bond:

    _____

This bond was set: At Arrest _____
              On Warrant _____
              After Hearing _____

    If bond is changed from that set in another District, the reason pursuant to Rule 40(f) is _____
_____
_____
_____

_____ If this space is checked, an evidentiary hearing pursuant to United States v. Nebbia, 357, F.2d 303
(2 Cir. 1966) shall be held prior to the posting of the bond. Such hearing shall be scheduled promptly upon
notification to the court that the defendant is ready to post bond.

7. The defendant has been advised by the court that if he or she is released on bond pursuant to the
conditions set forth herein or those later ordered by the court, the defendant is subject to arrest and
revocation of release and to various civil and criminal sanctions for any violation of those conditions.
These various sanctions and penalties are set forth more fully in the Appearance Bond itself.

8. The defendant is committed to the custody of the United States Marshal until an appearance bond has
been executed in accordance with this or subsequent court order.

    **DONE AND ORDERED** at <u>West Palm Beach, Florida</u> this <u>21st</u> day of <u>December</u>, 2011.

                                     _James M. Hopkins_ (signature)
                         **JAMES M. HOPKINS**
                      **UNITED STATES MAGISTRATE JUDGE**

c: Assistant U.S. Attorney
   Defense Counsel
   Pretrial Services/Probation

The source of Your deponent's information and the grounds for his belief are as follows:[1]

1.   I have been a Special Agent with the FBI for approximately 16 years.  Since late 1999, I have been the lead agent assigned to the investigation of the 1994 murder of Baumgardt, and two subsequent and related murders occurring in 1994 and 2003, as set forth more fully below.  The information contained in this Complaint comes from first-hand knowledge, my discussions with witnesses involved in the investigation, my discussions with other law enforcement agents and officers, my review of reports prepared by other law enforcement officers, my review of other evidence, including documents, photographs and recordings related to this investigation, and my training and experience.

A.   **The Murder of Julius Baumgardt**

2.   Mid-Island Check-Cashing Corporation ("Mid-Island") was a check-cashing business located in Massapequa, New York.  Mid-Island owned and operated armored vans that served as mobile check-cashing outlets for the employees of Mid-Island's

---

[1]    Because the purpose of this Complaint is to establish only probable cause to arrest, I have not set forth a description of all the facts and circumstances of which I am aware.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in sum and substance and in part, except where otherwise indicated.

2

customers, which included businesses located on Long Island, New York and in New Jersey. Mid-Island's armored vans were "motor vehicles" as defined in Title 18, United States Code, Section 31(a)(6). In June 1994, Volt Information Sciences, Inc. ("Volt") was a customer of Mid-Island, and was located in Syosset, New York.

3.      Julius Baumgardt ("Baumgardt") and Walter Tully ("Tully"), were persons employed by Mid-Island who jointly operated a Mid-Island armored van. On or about June 23, 1994, Baumgardt and Tully were assigned to deliver United States currency to Volt. As Baumgardt and Tully approached the Volt premises, the defendant SCOTT MULLIGAN ("MULLIGAN"), Christian Tarantino ("Tarantino") and Louis Dorval ("Dorval") approached Baumgardt and Tully, brandished firearms and ordered Baumgardt and Tully to lay on the ground. As Tully lay face-down and handcuffed, Dorval shot and killed Baumgardt. MULLIGAN and his accomplices then grabbed two satchels carried by Baumgardt, which contained the United States currency.

4.      Numerous individuals both inside and outside the Volt building witnessed the robbery and murder of Baumgardt. Two such eyewitnesses, John Does 1 and 2,[1/] were standing outside the building - a few feet from Baumgardt and Tully - when the crime

---

[1/]     I am aware of the identities of all the individuals referenced by aliases in this Affidavit.

occurred.  John Does 1 and 2 have previously testified[2] that
they saw two assailants on June 23, 1994.  According to John Does
1 and 2, one of those individuals, subsequently identified during
the course of the investigation as Dorval, was wearing a dark
business suit, a mustache and sunglasses, and was carrying a
handgun.  The second individual was wearing a rubber mask that
covered his entire head.  John Doe 1 described this mask as
resembling the face of a pig.  John Does 1 and 2 testified that
this second individual was carrying what both described as a
black, pump action, pistol grip shotgun that, as set forth below,
was purchased on behalf of Tarantino three days earlier.  John
Doe 2 further described one of the assailants as a large
individual, approximately six-foot-one-inch in height, with a
"heavy build".[3]

     5.    Jane Does 1 and 2 were employees of Volt, who
viewed the events from inside the building through ground-floor

---

[2]    On May 23, 2011, after a six-week jury trial conducted
before the Honorable Joanna Seybert, Tarantino was convicted of
participating in the June 23, 1994 murder of Julius Baumgardt, in
violation of 18 U.S.C. §§ 33 and 34, and the August 1994
obstruction of justice murder of Dorval, in violation of 18
U.S.C. § 1512.  See United States v. Christian Tarantino, 08 CR
655 (JS).  John Does 1 and 2, as well as John Doe 5 and Jane Does
1, 2 and 3, referenced infra, testified during that trial.

[3]    Your deponent has reviewed surveillance photographs taken of
MULLIGAN in the summer of 1994.  In those photographs, MULLIGAN
looks as if he could have weighed between 210-240 pounds during
that period.  Additionally, biographical data contained in
MULLIGAN's criminal history report indicates that he is six-foot-
one-inch tall.

4

windows looking out onto the building's parking lot.  According
to Jane Does 1 and 2, there were three assailants who ambushed
Baumgardt and Tully that morning.  At least two of those
individuals drove to the area in a red SUV, which was located
shortly after the murder and identified as a Chevy Blazer (the
"Blazer").  Both Jane Does 1 and 2 identified two of the
assailants as wearing rubber "pig masks."  According to Jane Does
1 and 2, one of these individuals was carrying a shotgun during
the robbery.

      6.   Moments after Dorval shot Baumgardt, the
assailants fled in the Blazer, and then abandoned the SUV only a
few hundred yards from where Baumgardt was killed.  The
assailants then sped away in a sedan, as described below.  Police
photographs of the Blazer taken soon after the murder show that
its windows were left open and the vehicle was not properly
aligned within the parking space.  The Blazer bore a Florida
license plate, with number PCX-42D.  That number matched all but
one digit of the six-digit identifier Jane Doe 1 relayed to law
enforcement in a 911 call made moments after the robbery and
murder of Baumgardt.[5/]

      7.   Subsequent investigation established that the
Blazer had been stolen from a car dealership in Hicksville, New
York, on or about January 28, 1994.  The license plate belonged

---

[5/]   In her 911 call to police, Jane Doe 1 identified the
Blazer's license plate as a Florida plate, number PCX420.

to a different vehicle that was registered to an elderly Florida woman, who died 11 days prior to the Baumgardt murder. The Blazer was processed by Nassau County Police Department ("NCPD") detectives in the Scientific Investigations Bureau. The detectives noted that the Blazer appeared to have been thoroughly cleaned. Nevertheless, shortly after the murder, a crime scene examiner recovered both human and animal hairs from the seats and floor of the Blazer.

     8.   After abandoning the Blazer, Baumgardt's killers entered a cream/metallic colored sedan and fled out of the parking lot in front of the Volt building onto Jericho Turnpike. Two eyewitnesses reported almost being struck by this second getaway car as it fled the Volt office complex and abandoned Chevy Blazer. According to Jane Doe 3, the individual driving the cream/metallic sedan appeared to be a heavier-set individual with his hair pulled back into a pony tail. I have reviewed police surveillance photos taken of MULLIGAN and others in the weeks after the Baumgardt murder. In those photos, MULLIGAN's hair resembles the description given by Jane Doe 3. Specifically, MULLIGAN wore his hair pulled back in a pony tail.

**B.**   **The Storage Unit**

     9.   In the weeks before the Baumgardt murder, NCPD detectives investigating an auto-theft ring conducted surveillance at a self-storage business in Farmingdale, New York. Tarantino, MULLIGAN and others were subjects of that

investigation.  On June 20, 1994, Nassau County Police Department ("NCPD") detective Jack Kennedy, while at the self-storage business, observed an associate of MULLIGAN and Tarantino's, Carl Vahldieck, use a driver's license of another MULLIGAN and Tarantino acquaintance, John Doe 3, to rent storage unit B-54.

10.  On the morning of June 24, 1994, the day after Baumgardt's murder, Detective Kennedy and his partner Detective Raymond Gene obtained a search warrant for storage unit B-54. After receiving a call from the manager of the storage facility advising that an individual was at the B-54 unit, Gene immediately drove to the storage facility as Kennedy waited for the warrant to be signed by a New York Supreme Court Justice.  As Gene arrived at the business, he saw MULLIGAN walk away from unit B-54, enter a white Lexus vehicle and drive away.  Kennedy arrived shortly after in time to see MULLIGAN driving out of the storage unit complex.  At the time, Detective Kennedy was very familiar with the MULLIGAN family through his work as a law enforcement officer in the Merrick/Bellmore area of Long Island. Detective Kennedy had served as a pall bearer at the funeral of MULLIGAN's brother, and was personally familiar with the defendant.  Further, Detective Kennedy noted the license plate of MULLIGAN's vehicle, which subsequently came back as being registered to MULLIGAN's mother.

11.  Upon executing the search warrant for unit B-54 a few minutes later, detectives Gene and Kennedy found a stolen

7

automobile and a canvas bag containing a Model 19, 9 mm Glock
pistol (serial # APX041US), a Mossberg, Model 88 12-gauge shotgun
with a pistol grip (serial # MV51077D) (the "Mossberg Shotgun"),
police radio scanners and walkie talkies.  Both John Does 1 and 2
have identified the Mossberg Shotgun found in the B-54 storage
unit as being similar to the one they observed during the June
23, 1994 robbery and murder of Baumgardt.  A firearms trace
conducted by the Bureau of Alcohol, Tobacco and Firearms ("ATF")
revealed that the Mossberg Shotgun was purchased on June 20, 1994
at a sporting goods store in Merrick, New York, by John Doe 4.
ATF records further revealed that the Glock pistol (serial #
APX041US) seized from the storage unit was purchased by Dorval in
Florida on February 28, 1994 - along with two other handguns -
four months before Baumgardt's murder.  John Doe 4 has testified
under oath that he purchased the Mossberg Shotgun at the request
of Vahldieck, with instructions that the weapon was needed by
Tarantino.

        12.  According to a Confidential Witness ("CW-1"), who
was a close partner and criminal associate of both MULLIGAN and
Tarantino, in the days following the Baumgardt murder, NCPD
detectives questioned several young male individuals, including
Vahldieck and John Does 3 and 4, about their connection to the B-
54 storage unit and the weapons found inside it.  CW-1[2]/ reported

---

[2]/    Following initial meetings with Your deponent and others in
2007, CW-1 stated that he received information that Tarantino

this information to MULLIGAN, who expressed concern that John Doe 4 was cooperating with authorities. According to CW-1, MULLIGAN then instructed CW-1 to take Vahldieck and John Does 3 and 4 to a Long Island-based attorney, whose identity is known, who was familiar with MULLIGAN and Tarantino. The purpose of taking these individuals to the attorney was to obtain written (and false) statements from them that would tend to exculpate MULLIGAN or Tarantino concerning their connection to storage unit B-54 and the purchase of the Mossberg Shotgun.

13. On or about July 4, 1994, one of the members of MULLIGAN and Tarantino's circle of associates, Gus Kritikos, was involved in a motorcycle accident on Long Island, which left Kritikos in vegetative state. According to CW-1, following that accident, MULLIGAN stated to CW-1 and others that, should they be questioned about the purchase of the Mossberg Shotgun found in the storage unit, they should indicate that the shotgun had been

_____

and/or others knew that he had met with federal law enforcement agents. Subsequently, CW-1 stated that he was unwilling to testify out of fear of retaliation, and would, if subpoenaed, claim that his earlier statements were coerced. More recently, CW-1 has stated that he is prepared to testify in open court, and that the information he provided Your deponent beginning in 2007, as summarized herein, is true and accurate. The information provided by CW-1 as set forth herein has been corroborated by numerous sources and witnesses. Accordingly, I deem CW-1 to be reliable.

purchased at the direction of Kritikos - not Tarantino - since Kritikos was incapacitated.[1/]

C.  **MULLIGAN's Expressed Concern that His DNA Would Be Recovered from the Blazer, Which was Abandoned at the Scene of the Baumgardt Murder**

14.  On July 13, 2000, grand jury subpoenas directed MULLIGAN, Tarantino and others to provide buccal swabs, hair samples, palm prints and finger prints in an effort to link them to forensic evidence retrieved from the Blazer after the armored car robbery and murder of Baumgardt.  MULLIGAN's hair and buccal swab were taken on July 26, 2000 at the NCPD Headquarters by NCPD Homicide Squad detectives working in conjunction with Your deponent on the Baumgardt and Dorval murder investigations. Sometime thereafter, during the summer of 2000, MULLIGAN called CW-1 and requested that CW-1 immediately come to his house in Bellmore, New York to speak with him.  In a statement CW-1 provided to investigators in 2007, CW-1 indicated that during their 2000 conversation, MULLIGAN appeared visibly nervous about the taking of his DNA.  According to CW-1, MULLIGAN stated that Tarantino speculated that the request for DNA was in connection with an unrelated federal narcotics and money laundering

_____

[1/]    Nothwithstanding evidence to the contrary, including the trial testimony of John Doe 4, who purchased the Mossberg Shotgun at Vahldieck's direction, that it was needed by Tarantino, Vahldieck has maintained as late as January 2010 that the Mossbery Shotgun was intended for Kritikos.

investigation of which MULLIGAN and Tarantino were aware.[1]

However, according to CW-1, MULLIGAN was convinced that the DNA

was related to another unspecified matter.

      15.  In or about September 2000, MULLIGAN attended a

wedding in Great Neck, New York, which was also attended by a

Cooperating Witness ("CW-2").  CW-2 is a cooperating defendant

who pled guilty to Conspiracy to Defraud the United States, in

violation of 18 U.S.C. § 371, and Conspiracy to Collect Unlawful

Debts - Gambling, in violation of 18 U.S.C. § 1956(h).  CW-2

entered his pleas pursuant to a cooperation agreement with the

United States Attorney's Office for the Eastern District of New

York.  CW-2 has consistently been deemed reliable by other

handling agents.  At the wedding, MULLIGAN spoke to CW-2, who was

known as an individual with a scientific background with

experience in defending against DNA evidence in criminal matters.

MULLIGAN indicated to CW-2, in sum and substance, that he was

concerned because federal authorities had recently taken a DNA

sample from him in an effort to link his DNA to hair found at the

scene of a crime.  According to CW-2, MULLIGAN mentioned that his

hair might have been discovered in a "hat" or a "mask" that had

been found near the scene of a robbery.  According to CW-2,

---

[1]    In or about April 2001, MULLIGAN was one of 25 defendants
indicted on RICO narcotics and money laundering charges in the
Eastern District of New York.  He pled guilty to conspiracy to
distribute marijuana and was sentenced to 37 months in prison, in
November 2002.  He surrendered to Bureau of Prisons authorities
on January 10, 2003.

MULLIGAN described the robbery as an "armored something," and
MULLIGAN wanted to know what his options were.  When CW-2
specifically asked whether the hair found was MULLIGAN's,
MULLIGAN responded that it was.

D.    **MULLIGAN's Admission to CW-1**

16.    CW-1 advised that MULLIGAN and Tarantino had
learned, from unknown sources, that eyewitnesses at the Baumgardt
murder site described to police that one of the assailants was
heavy, and six-foot-one to six-foot-three in height.  Although
this was an approximation, rather than an exact description, CW-1
stated that within MULLIGAN and Tarantino's crew of criminal
associates, only two individuals approximated that description:
MULLIGAN and John Goetz (hereinafter "Goetz").[2/]

17.    Goetz was a friend and criminal associate of
MULLIGAN and Tarantino, and an acquaintance of CW-1.  In or about
August 2000, Goetz was arrested by the U.S. Drug Enforcement
Administration and charged with conspiring to distribute the
"date-rape drug," known as GHB.  In or about May 2001, after
being released on bail, Goetz was found dead inside his New York
City apartment as a result of natural causes.  Sometime after
Goetz's death, CW-1 and MULLIGAN had dinner together at a
restaurant in Massapequa, New York.  During the course of the

---

[2/]    Biographical data taken from a 2000 criminal history report
for John Goetz indicates that Goetz was six-foot-two and 210
pounds in that year.

evening, CW-1 stated that he missed Goetz.  MULLIGAN responded, in sum and substance, that "some good" had come from Goetz's death because Goetz had now become MULLIGAN's "cover story." Given MULLIGAN's prior direction to CW-1 and others to blame Kritikos for the purchase of the Mossberg Shotgun, CW-1 understood MULLIGAN to be stating that, in the event of an arrest for the Baumgardt murder, MULLIGAN would defend himself by using the deceased Goetz as fitting the description of the larger individual described by eyewitnesses at the Baumgardt murder scene.

### E.   Law Enforcement's Contact with MULLIGAN's friend and Criminal Associate Vincent Gargiulo

18.   In May 2003, Your deponent received a letter, addressed to the Long Island Resident Agency of the FBI, which read in part:

> I'm writing you to see if there is a reward
> for information and audiotapes leading to the
> arrest and conviction of Scott Mulligan
> Christ [sic] Tarantino and others in the 1994
> armored car robbery where a guard was shot
> dead and the death of one of the robbers
> named Louie who was also shot dead and found
> floating off Long Island.

19.   The author of the letter used the pseudonym "Chucky" and claimed that he was not involved in the crimes and therefore did not "want a deal, I just want money."  "Chucky" invited the FBI to contact him through the website craigslist.com.

13

20.    On May 29, 2003, Your deponent, and another agent
met "Chucky," who was in fact Vincent Gargiulo, a long time
friend and former criminal associate of Tarantino and MULLIGAN's.
Gargiulo reported that, several years earlier, he, Tarantino and
MULLIGAN became partners in a Manhattan health club.  Gargiulo
had suffered from emotional and substance-abuse problems and was
hospitalized for a time after the club, named Body Sculpt,
opened.  During his hospitalization, Gargiulo lost control of
Body Sculpt's operation.  When he returned from his
hospitalization, Gargiulo discovered that Body Sculpt was in
arrears regarding payments to its landlord and various creditors.

21.    Gargiulo claimed that Tarantino and MULLIGAN sold
Body Sculpt's equipment without consulting with him and that they
kept the proceeds of those sales rather than pay the gym's
creditors.  Consequently, Gargiulo believed that Tarantino and
MULLIGAN cheated him, and offered to provide the FBI, in exchange
for money, with an audio tape that would tend to prove that
MULLIGAN and Tarantino were, among other things, responsible for
the 1994 murder of Baumgardt.  Gargiulo further advised, in sum
and substance, that Tarantino and MULLIGAN knew of the existence
of the audio tape.

22.    On the morning of August 18, 2003, Gargiulo was
shot and killed near the corner of West 30th Street and Broadway
in Manhattan by an individual named Justin Bressman.  Bressman
was an employee of Tarantino's at the time of the murder.

14

23.  On or about April 6, 2004, the New York City
Police Department received an anonymous mailing containing a
micro-cassette audiotape with the recorded voices of Tarantino
and Gargiulo.   Based on various references, including the extent
of Tarantino's wife's pregnancy with their first child and a
reference that it had been two months since the FBI took his DNA
exemplar, the tape was made in or about September 2000 inside
Tarantino's Manhattan apartment and a nearby hallway.   This would
also place the making of the tape at or about the same time that
MULLIGAN expressed to CW-1 and CW-2 concerns about the taking of
his DNA exemplars.

24.  On the audio tape, which has been subjected to
forensic analysis by the FBI, deemed to have been an original and
unaltered or edited recording, and admitted into evidence as
authentic pursuant to the Federal Rules of Evidence at the
Tarantino trial earlier this year, Tarantino admits his role in
the Baumgardt, as well as Dorval murders.   Specifically,
Tarantino recounts to Gargiulo how during the armored car robbery
that left Baumgardt dead, he and his accomplices drove to the
robbery in a "red stolen vehicle," and that they subsequently
"changed tails" after the robbery and murder and fled in a
different vehicle.

25.  Tarantino further stated to Gargiulo on the
recording that the government "had" the vehicle that he and his
accomplices abandoned at the scene, and that although he and

15

others had "cleaned the car for a couple of hours" before the
robbery, Tarantino was concerned that law enforcement had
recently taken his DNA sample for analysis - going so far as to
state that he thought his sample would match, or "come back" to
DNA found in the getaway vehicle. In discussing his concerns
with Gargiulo, Tarantino also stated that he had discussed the
matter with MULLIGAN and, in sum and substance, had assured
MULLIGAN that prosecution for the Baumgardt murder would be
impossible so long as both men refused to cooperate with law
enforcement authorities. Tarantino reported that he and MULLIGAN
were fairly confident that the taking of DNA was meant to scare
one of them into doing something "stupid," such as cooperating
with federal authorities. Tarantino reported that while, "I
don't think SCOTT is as strong as, say, a lot of other guys,"
Tarantino believed MULLIGAN was "smart" and would calculate that
even with cooperation in the Baumgardt murder investigation, he
would inevitably face a lengthy prison sentence. Later in the
conversation, Tarantino (designated "CT"), and Gargiulo
(designated "VG"), are overheard stating the following:

> VG: That's a good thing. All you have to worry about
> is you and SCOTT.
>
> CT: Yeah.
>
> VG: SCOTT understands that, right?
>
> CT: Yeah, [unintelligible or "UI"].
>
> VG: I don't know about that.

16

CT:  He is, yeah.

VG:  Well, that's a fuckin' good thing.  So you really
     -- you really should just drop it.  Don't talk
     about it with anybody.

                    *      *      *      *      *

VG:  You got to really beat that into SCOTT'S head.

CT:  Yeah, no.  He's listening . . . .

    26.  Nevertheless, Tarantino and Gargiulo go on in the recording to discuss how the recent taking of MULLIGAN's DNA sample in connection with the Baumgardt murder had made MULLIGAN nervous, and had even prompted MULLIGAN to go "on the lam" for a period of time:

CT:  [Tarantino's lawyer] said, well [UI].  Here's
     the deal.  He said, if you don't give it to
     them [a DNA sample], the U.S. Attorney is
     going to call up your fucking parole officer,
     he's going to call DAN PERRONE.  They're
     going to have you violated immediately.  And
     just so you know, I've been checking it out.
     He goes, here's the deal.  He goes, they can
     get a fuckin' court order, no fuckin'
     problem; and they will, okay, CHRIS?  Before
     you get -- and they will.  He goes, so if you
     don't like giving it to them, you're going to
     be automatically violated because if you give
     it to them, you're going to get out.  Get
     out.  How the fuck is that happening, you
     know what I mean.  I'm like, it's coming
     back.  I'm thinking, what does it take, ten
     days?  Supposedly it takes two to three
     months.

VG:  How long's it been?

CT:  Two months and change.

VG:  Oh, shit.

CT:  Yeah.

VG:   Now, it makes more sense that SCOTT'S doing
      everything.  I was going to tell you how long
      ago SCOTT running [UI] . . . .

                  *     *     *     *     *

VG:   Umm, you know what there, I think - just so
      you know, it's all over Bellmore, that shit
      SCOTT'S doing.

CT:   Yeah.

VG:   It comes back to me. I get a call from BOB,
      who is in a dirt bag bar; and he
      found out.  I go, what the fuck you talking
      about, SCOTT'S not, you know, on the - you
      know, basically he's on the lam.  SCOTT'S not
      on the lam.  It is the stupidest thing I ever
      [UI].  He was on [UI].

CT:   Yeah.

VG:   Turns out, he's right . . . .

        27.   Later in the conversation, however, Tarantino

assured Gargiulo that MULLIGAN was "alright now because we sat

around and kicked it around."   Tarantino and Gargiulo's

statements in September 2000 about MULLIGAN's nervousness with

respect to his DNA being taken by law enforcement are consistent

with the information provided by CW-1 and CW-2 regarding their

respective conversations with MULLIGAN during the summer of 2000,

discussed more fully above, during which MULLIGAN expressed that

same trepidation to them.

**F.   MULLIGAN'S mtDNA Matches that of a Hair Extracted from the
       Blazer**

        28.   In November 2011, FBI laboratory analysis reported

that MULLIGAN's mitochondrial DNA ("mtDNA") was the same as mtDNA

extracted from a Caucasian hair found in the Blazer immediately following the Baumgardt murder.  The FBI's analysis compared the frequency of the mtDNA sequence displayed by the Caucasian hair sample and MULLIGAN's known exemplar to the general population. The analysis concluded that the mtDNA sequence in the Caucasian hair sample and MULLIGAN's appeared in only 0.17% of the Caucasian population.[10/]  Two other hairs found in the Blazer after the Baumgardt murder have also been matched to the same mtDNA found in blood and saliva samples obtained from Dorval and Tarantino, respectively.

WHEREFORE, Your deponent respectfully requests that an arrest warrant issue for the defendant SCOTT MULLIGAN so that he can be dealt with according to law.

---

[10/]   The mtDNA analysis results do not provide a unique identifier because mtDNA is inherited from one's mother, usually with no change in mtDNA from mother to offspring.  Therefore, MULLIGAN's mother, siblings and other extended family members on his mother's side will, absent mutations, have the same mtDNA match to the Caucasian hair sample obtained from the Blazer. More definitive nuclear DNA analysis would have required the recovery of blood or tissue, in addition to hairs, from the Blazer and, thus, is not available.

WHEREFORE, Your deponent further respectfully requests that this Complaint and Affidavit, as well as the arrest warrant, be filed under seal until such time as the defendant is arrested.

ROBERT F. SCHELHORN, Jr.
Special Agent
Federal Bureau of Investigation

Sworn to before me this
20th day of December, 2011

(S) Tomlinson, MJ

UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

AO 442 (Rev. 01/09)  Arrest Warrant

# UNITED STATES DISTRICT COURT
### for the
Eastern District of New York

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. |
| SCOTT MULLIGAN | ) |
| | ) |
| _____ | ) |
| *Defendant* | |

# MJ-11-1252

## ARREST WARRANT

To:     Any authorized law enforcement officer

       **YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*    SCOTT MULLIGAN _____,
who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment    ☐ Superseding Indictment    ☐ Information    ☐ Superseding Information    ☑ Complaint
☐ Probation Violation Petition    ☐ Supervised Release Violation Petition    ☐ Violation Notice    ☐ Order of the Court

This offense is briefly described as follows:

   Willfully Endangering the Safety of a Commercial Motor Vehicle Operator Resulting in Death, in violation of Title 18, United
States Code, Sections 33, 34 and 2.

Date:   12/20/2011 _____

             |s| Tomlinson, MJ-
             *Issuing officer's signature*

City and state:   Central Islip, New York _____

       Hon. Kathleen A. Tomlinson, U.S. Magistrate Judge
             *Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____, and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____                     _____ |
|                                           *Arresting officer's signature* |
|                                           *Printed name and title* |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                  U N S E A L I N G
                                          A P P L I C A T I O N
        - against -
                                          MJ-11-1252
SCOTT MULLIGAN,

                Defendant

                Defendant.

- - - - - - - - - - - - - - - - -X

        The UNITED STATES OF AMERICA, by Assistant United States
Attorney James Miskiewicz, hereby requests that an Order issue
unsealing the arrest warrant and affidavit in support, which had
been issued on December 20, 2011 under seal by the Honorable A.
Kathleen Tomlinson, United States Magistrate Judge for the Eastern
District of New York.   The warrant was executed earlier today and
the defendant is in custody awaiting initial appearance before a
Magistrate Judge in the Southern District of Florida.   Accordingly,
there remains no further reason to seal this matter, the government
requests that it be unsealed.

                        Respectfully Submitted,

                        LORETTA E. LYNCH
                        United States Attorney
                        Eastern District of New York

                        by
                        James Miskiewicz
                        Assistant United States Attorney

Dated: Central Islip, New York
       December 21, 2011

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                 U N S E A L I N G
                                         O R D E R
       - against -
                                         MJ-11-1252
SCOTT MULLIGAN,

              Defendant

- - - - - - - - - - - - - - - - - - -X

          Upon the motion of the UNITED STATES OF AMERICA, by
Assistant United States Attorney James Miskiewicz, the arrest
warrant in the above-captioned matter having been executed earlier
today, and there being no further reason to seal this matter, the
government's application is ORDERED unsealed.

                        |s| Tomlinson , m J .
SO ORDERED:
                  THE HONORABLE A. KATHLEEN TOMLINSON
                  UNITED STATES MAGISTRATE JUDGE


Dated: Central Islip, New York
       December 21, 2011